UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
CHRISTOPHER COUCH,

                                  Plaintiff**,**        **MEMORANDUM & ORDER**
                                                            13-CV-2004 (DRH)(GRB)
    v.

AT&T SERVICES, INC.,

                                  Defendant.
----------------------------------------------------------------X
**APPEARANCES:**

**For the Plaintiff:**
**BERNBACH LAW FIRM PLLC**
106 Corporate Park Drive
White Plains, New York 10601
By: Jason Bernbach, Esq.

**For the Defendant:**
**PAUL HASTINGS LLP**
75 East 55th Street
New York, New York 10022
By: Patrick W. Shea, Esq.

**HURLEY, Senior District Judge**:

       Plaintiff Christopher Couch ("Couch") brings this action against defendant AT&T Services, Inc. ("AT&T"), claiming that AT&T discriminated against him on the basis of his age, in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*, the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law, Article 15, § 290 *et seq.*, and the New York City Human Rights Law ("NYCHRL"), NYC Admin. Code §§ 8-10 *et seq.*, as amended by the Local Civil Rights Restoration Act of 2005. Presently before the Court is AT&T's motion to compel arbitration pursuant to Section 4 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4, and thus dismiss the pending Complaint as all of the claims are subject to arbitration. For the reasons stated below, AT&T's motion is granted.

## BACKGROUND

The following facts are drawn from the Complaint and the papers submitted by the parties in connection with the instant motion.

Couch, a sixty-two year-old male, was employed by AT&T from April 28, 2008 until he was discharged on July 6, 2012. (Compl. ¶¶ 5, 8.) According to AT&T, during late 2011 and early 2012, it sent emails to its employees to notify them that a program was being implemented by the company under which all disputes between the company and its employees would be resolved by binding arbitration. (Declaration of Kathleen A. Matyola, dated June 27, 2013 ("Matyola Decl.") at ¶ 2; Declaration of Jeremy Dunlap, dated June 24, 2013 ("Dunlap Decl.") at ¶¶ 4, 5, 6.) In that regard, AT&T asserts that on December 5, 2011, and again on December 16, 2011 and January 16, 2012, it sent emails to Couch's company email address containing the subject heading "Action Required: Arbitration Agreement." (Dunlap Decl. at ¶ 8 & Exh. 1.) The contents of the emails stated:

> **Action Required: Notice Regarding Arbitration Agreement**
>
> AT&T has created an alternative process for resolving disputes between the company and employees. Under this process, employees and the company would use independent, third-party arbitration rather than courts or juries to resolve legal disputes. Arbitration is more informal than a lawsuit in court, and may be faster.
>
> The decision on whether or not to participate is yours to make. To help make your decision, **it is very important for you to review the Management Arbitration Agreement linked to this email.** It provides important information on the process and the types of disputes that are covered by the Agreement.
>
> Again, the decision is entirely up to you. To give you time to consider your decision, the company has established a deadline of no later than 11:59 p.m. Central Standard Time on Monday, Feb. 6, 2012 to opt out - that is, decline to participate in the arbitration process – using the instructions below.

> If you do not opt out by the deadline, you are agreeing to the arbitration process as set forth in the Agreement. This means that you and AT&T are giving up the right to a court or jury trial on claims covered by the Agreement.
>
> **Instructions for "Opting Out" of the Agreement:**
>
> **To opt out of the agreement, after you open the attached document, follow the link provided there to the site where you will be able to electronically register your decision to opt out.**
>
> Remember, the decision is yours. There are no adverse consequences for anyone opting out of the Management Arbitration Agreement. If, contrary to this assurance, you believe you have experienced any pressure or retaliation in connection with your decision, please contact the AT&T Hotline (888-871-2622).
>
> If you have any questions about the Agreement, please contact OneStop (Dial 1-888-722-1787, then speak "Employee Service Hotline").
>
> **Important: February 6, 2012 is the deadline to act if you do not wish to resolve disputes through arbitration.**

(*Id.* at Exh. 1.)

The emails also provided a link to the Management Arbitration Agreement (the "Agreement"), with the link containing the words "Click here to review." (*Id.* at ¶ 9 & Exh. 1.) The Agreement expressly "applie[d] to any claim [the employee] may have against . . . any AT&T company," including claims "arising out of or related to [the employee's] employment or termination of employment with the Company and any other disputes regarding the employment relationship, . . . termination, . . . discrimination . . . and claims arising under the . . . Age Discrimination in Employment Act, . . . and state and local statutory and common law claims." (*Id.* at Exh. 2, p. 1-2.) In addition, the Agreement provided that it "survives after the employment relationship terminates." (*Id.* at Exh. 2, p. 2.)

AT&T argues that Couch did not opt out of the Agreement, and continued his employment with the company. (Def.'s Mem. at 3.) Moreover, AT&T argues that despite Couch's purported failure to opt out of the Agreement, and, thus, his agreement to resolve any

disputes with AT&T through arbitration, Couch nevertheless filed the instant lawsuit on April 10, 2013. (*Id.*) Accordingly, AT&T filed the instant motion to dismiss and compel arbitration, arguing that Couch was contractually obligated to resolve all disputes with it through arbitration, including the dispute at issue in the instant action. (Def.'s Mem. at 1.)

Couch, on the other hand, argues that he never received the emails AT&T claims to have sent him on December 5, 2011, December 16, 2011, and January 16, 2012, nor did he have access to or knowledge of the existence of the Agreement. (Pl.'s Mem. in Opp'n. at 1-2.) Thus, Couch posits that he was completely unaware that he was required to opt out of the arbitration process so as to prevent being bound by the terms of the Agreement. (*Id.*) As such, Couch argues that no agreement to arbitrate was ever reached by the parties. (*Id.* at 7-22.)

## DISCUSSION

### I. *Applicable Law and Standard of Review*

The Federal Arbitration Act (FAA), 9 U.S.C. § 1 *et seq.*, provides that written provisions to arbitrate controversies in any contract involving interstate commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "Employment contracts, except for those covering workers engaged in transportation, are covered by the FAA." *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 289 (2002). The FAA establishes a liberal federal policy favoring arbitration, *Campaniello Imps., Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d 655, 665 (2d Cir. 1997), and "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).

The FAA states in relevant part:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement . . . .

9 U.S.C. § 3. Thus, while under the FAA a district court initially decides whether the parties to a civil action agreed in writing to arbitrate particular issues, once the court determines that they did agree to arbitrate the issues, the FAA gives the court no discretion: it must compel arbitration of the arbitrable issues. *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985); *Teah v. Macy's Inc.*, 2011 WL 6838151, at *3 (E.D.N.Y. Dec. 29, 2011). However, where all of a plaintiff's claims are arbitrable, the court may dismiss the entire action instead of staying it. *See Lewis Tree Serv., Inc. v. Lucent Techs., Inc.*, 239 F. Supp. 2d 332, 340 (S.D.N.Y. 2002) (citing *Seus v. John Nuveen & Co., Inc.,* 146 F.3d 175, 179 (3d Cir. 1998), *overruled on other grounds*, *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79 (2000); *Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir. 1992)).

Notwithstanding the strong presumption in favor of arbitration that it has created, "the FAA does not require parties to arbitrate when they have not agreed to do so." *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989). "[B]efore a party can be required to submit to arbitration, it is entitled to a judicial determination of the threshold question of whether it ever entered into an agreement which obliges it to consent to arbitration." *PMC, Inc. v. Atomergic Chemetals Corp.*, 844 F. Supp. 177, 181 (S.D.N.Y. 1994). Whether the parties agreed to arbitrate is generally determined by state contract law. *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).

In New York, "courts look to the basic elements of the offer and the acceptance to determine whether there is an objective meeting of the minds[,] [and] [t]he manifestation or expression of assent necessary to form a contract may be by word, act, or conduct which evinces the intention of the parties to contract." *Minelli Constr. Co., Inc. v. Volmar Constr., Inc.*, 82 A.D.3d 720, 721 (2d Dep't 2011) (citations and internal quotation marks omitted). Although New York law requires a party seeking arbitration to establish the existence of an express and unequivocal agreement to arbitrate, *Am. Centennial Ins. Co. v. Williams*, 233 A.D.2d 320, 320 (2d Dep't. 1996), "a higher standard than for nonarbitration agreements, . . . the Second Circuit has held that this rule is preempted by the FAA because it discriminates between arbitration agreements and other contracts." *Software for Moving, Inc. v. La Rosa Del Monte Express, Inc.*, 2009 WL 1788054, at *7 (S.D.N.Y. June 23, 2009) (citing *Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional de Venezuela*, 991 F.2d 42, 46 (2d Cir. 1993)), *aff'd*, 419 F. App'x 41 (2d Cir. 2011). Thus, "a party seeking arbitration need only prove the existence of a valid arbitration agreement by a preponderance of the evidence." *Id.*; *see also Progressive Cas. Ins. Co.*, 991 F.2d at 46 (observing that "New York law requires that nonarbitration agreements be proven only by a mere preponderance of the evidence").

"In reviewing motions to compel arbitration brought under the FAA, 'the court applies a standard similar to that applicable for a motion for summary judgment.' " *Teah*, 2011 WL 6838151, at *4 (citing *Bensadoun v. Jobe Riat*, 316 F.3d 171, 175 (2d Cir. 2003); *Sanders v. Forex Capital Mkts., LLC*, 2011 WL 5980202, at *3 (S.D.N.Y. Nov. 29, 2011)). "If there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary." *Id.* (quoting *Bensadoun*, 316 F.3d at 175) (internal quotation marks omitted). Nevertheless, "[i]f the party seeking arbitration has substantiated the entitlement [to arbitration] by a showing of

6

evidentiary facts, the party opposing may not rest on a denial but must submit evidentiary facts showing that there is a dispute of fact to be tried." *Id.* (quoting *Oppenheimer & Co. v. Neidhardt*, 56 F.3d 352, 358 (2d. Cir.1995)) (internal quotation marks omitted).

## II.     *Whether an Agreement to Arbitrate Disputes was Reached*

In this case, the only disputed issue is whether an agreement to arbitrate was reached by the parties. AT&T argues that an agreement to arbitrate existed between it and Couch as of February 6, 2012, the date by which Couch was required to opt out of the Agreement but did not do so. (Def.'s Mem. at 7-8.) AT&T provides evidence of three emails that it sent to Couch, which "specifically laid out the material provisions of the Agreement," "specified a method and deadline for acceptance," and contained a link to the Agreement. (*Id.* at 8.) In this regard, AT&T comes forth with declarations from its Lead Manager in Marketing Communications, Kathleen A. Matyola, two of Couch's supervisors, Robert Handal (Declaration of Robert Handal, dated June 28, 2013 ("Handal Decl.")) and Laura Edlund (Declaration of Laura Edlund, dated June 26, 2013 ("Edlund Decl.")), and Jeremy Dunlap, an Application Technical Support Specialist at Accenture, a company that provided AT&T with technical support for various computer systems and software applications. These declarations state, *inter alia*, that: emails were sent "to all of AT&T's U.S.-based management employees beginning on November 30, 2011," which provided notice of the Agreement and contained a link to the Agreement that was located on AT&T's intranet system (Matyola Decl. at ¶¶ 3, 4, 5 and Exh. 1); the page containing the text of the Agreement contained a button for the email recipient to click in acknowledgment of having seen the Agreement (*id.* at ¶ 5); reminder emails were sent "to those recipients of the initial email who had not yet clicked on the acknowledgement button on the arbitration agreement page" (*id.* at ¶¶ 6, 7); the program used in conjunction with AT&T's email system to

send the emails had previously been used "to communicate AT&T policies for review and acknowledgment . . . on approximately 20 occasions" and had "reliably . . . distribute[d] such reviews" (*id.* ¶ 3); AT&T's email log reveals that the initial email and two subsequent reminder emails were sent to Couch's unique AT&T email address, cc123x@us.att.com (Dunlap Decl. at ¶¶ 7, 8; Handal Decl. at ¶ 3; Edlund Decl. at ¶ 3); and Couch was required to monitor his AT&T email address and appropriately respond to any emails he received (Handal Decl. at ¶ 4; Edlund Decl. at ¶ 4). AT&T argues that Couch's continuing to work after having been given an opportunity to opt out of the arbitration program but failing to do so constituted his acceptance of the arbitration agreement. (Def.'s Mem. at 8.)

Couch counters, however, that despite AT&T's offering of evidence that it sent emails to Couch regarding the Agreement, AT&T cannot establish that Couch actually received those emails, and, consequently, there is an issue of fact as to whether an enforceable agreement to arbitrate claims was reached by the parties. (*See* Pl.'s Mem. in Opp'n. at 18-19.) Thus, the Court must determine whether there is a genuine issue of fact that Couch received the emails regarding the Agreement.

Couch cites *Raniere v. Citigroup Inc.*, 827 F. Supp. 2d 294, 306-08 (S.D.N.Y. 2011), *rev'd on other grounds*, 533 F. App'x 11 (2d Cir. 2013), in which case the evidence established that the plaintiff had received an email concerning an arbitration agreement and thus the court found that the plaintiff had consented to the arbitration agreement by continuing to work after receiving notice of the arbitration agreement. Couch argues that, in contrast to *Raniere*, this case lacks evidence that he received the three emails about the Agreement which were purportedly sent by AT&T. (Pl.'s Mem. in Opp'n. at 19-20.)

Couch also argues that while the program used to transmit the emails to AT&T's employees may have been "reliable," it was not infallible. (*Id.* at 21.) Moreover, Couch asserts that the fact that nearly 20,000 employees, representing approximately 20% of the intended recipients of the emails, did not respond to the emails, like Couch, indicates that their failures to respond were likely the result of having never received the emails. (*Id.*) Finally, Couch argues that the fact that he did not utilize the link to the Agreement contained in the emails, especially when considering that his job required him to appropriately respond to all work emails, and the emails designated the Agreement as "very important" to review, creates an inference that he did not receive the emails in the first place. (*Id.* at 21-22.)

Here, the Second Circuit's summary decision in *Manigault v. Macy's E., LLC*, 318 F. App'x 6 (2d Cir. 2009) provides useful guidance on the issue of Couch's receipt of the emails. In *Manigault*, the plaintiff filed a lawsuit against the defendants asserting claims of sexual harassment and retaliation in violation of federal and state laws. 318 F. App'x at 6-7. The district court denied the defendants' motion to compel arbitration and the defendants appealed. *Id.* at 7. The defendants in *Manigault* had notified their employees about a dispute resolution program via mail and permitted the employees to opt out of an arbitration program. *Id.* The plaintiff claimed that she was unable to opt out of the arbitration program because she did not receive the mailing that had been sent by the defendants, which contained the information about the program and the opt-out form. *Id.* The plaintiff offered evidence of her own denial of receipt of the defendants' mailing, as well as denials by two other employees. *Id.* The defendants, on the other hand, offered evidence by way of affidavit testimony of employees that the plaintiff had been mailed the dispute resolution program documents, and that the company's records did not indicate that the mailing to the plaintiff had been returned as undeliverable. *Id.*

The Second Circuit in *Manigault* applied New York law in which there is "a presumption that a party has received documents when [the documents are] mailed to the party's address in accordance with regular office procedures." 318 F. App'x at 7 (citing *Meckel v. Cont'l Res. Co.*, 758 F.2d 811, 817 (2d Cir. 1985)). Upon reversing the district court's decision, the Second Circuit found that the defendants' evidence of the employees' affidavit testimony created a rebuttable presumption that the plaintiff had received the dispute resolution program information. *Id.* Further, the Second Circuit found the plaintiff's evidence of her and two other employees' denials of receipt of the defendants' mailing to be "insufficient to rebut the presumption that she received the mailing." *Id.* Finally, applying state-law principles regarding the formation of contracts, the Second Circuit concluded that the plaintiff's continuing to work after having received notice of the dispute resolution program constituted her assent to the arbitration agreement by way of conduct evidencing mutual assent. *Id.* at 7-8.

Here, like in *Manigault*, AT&T has produced declarations which evidence that three emails were sent to Couch notifying him about the Agreement and indicating that he needed to opt out of the program if he did not wish to be bound by the Agreement. Couch, in response, offers his denial of receipt of the emails. However, as the Second Circuit determined in *Manigault*, mere denials of receipt are insufficient to rebut the presumption that the emails were received. *See also Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735-36 (7th Cir. 2002) (finding a plaintiff's testimony that she could not remember seeing the arbitration email insufficient to create an issue of fact where the defendant offered evidence that the notice was sent and presumably received); *Abdullah v. Am. Express Co.*, 2012 WL 6867675, at *4-5 (M.D.Fla. Dec. 19, 2012) (finding that the presumption of delivery applicable to mail also applies to emails, and holding that the plaintiff's denial of receipt of an email containing notice of an arbitration

agreement was insufficient to rebut the presumption that he had received the email), report and recommendation adopted, 2013 WL 173225 (M.D.Fla. Jan 16. 2013).

Although Couch argues that the Court should disregard the *Managault* decision based upon the district court's decision in *Alvarez v. Coca-Cola Refreshments, USA, Inc.*, 2012 WL 1940858 (E.D.N.Y. May 29, 2012), which deemed the Second Circuit's analysis in *Manigault* "unsound" (Pl.'s Mem. in Opp'n. at 8), this Court respectfully disagrees with the *Alvarez* court's reasoning. The *Alvarez* court disagreed with the Second Circuit's finding in *Manigault* that an employee's continuing to work, after being informed that such continuation would be deemed an agreement to arbitrate, creates a binding arbitration agreement. *Alvarez*, 914 F. Supp. 2d at 258. While acknowledging that the Second Circuit's "conclusion finds support in New York contract law," which law provides that a party's conduct can manifest assent to an agreement, the *Alvarez* court nevertheless reasoned that the Second Circuit's conclusion was not in "harmon[y] with the New York Court of Appeals' directive that claims not be forced into arbitration 'unless the evidence establishes the parties' clear, explicit and unequivocal agreement to arbitrate.' " *Id.* (quoting *Fiveco, Inc. v. Haber*, 11 N.Y.3d 140, 144 (2008)). However, this analysis runs afoul of the Second Circuit's holding that "requir[ing] [a] party seeking arbitration to show 'an express, unequivocal agreement' to arbitrate" impermissibly "discriminates between arbitration agreements and other contracts." *Software for Moving, Inc.*, 2009 WL 1788054, at *7 (citation omitted). Accordingly, the Second Circuit in *Manigault* did not err in applying New York's general principles regarding contract formation.

In addition, the *Alvarez* court faulted the application in *Manigault* of a rebuttable presumption that the plaintiff had received the arbitration materials because, in the *Alvarez* court's opinion, such rebuttable presumption should not be used in the context of a contract

11

formation where the sender is doing more than providing mere notice, but, rather, is "extend[ing] an offer to an unwitting recipient." *Alvarez*, 914 F. Supp. 2d at 258-59. The *Alvarez* court observed that the only case cited by the Second Circuit in *Manigault* to support to use of a rebuttable presumption in the context of the formation of an arbitration agreement was *Meckel v. Cont'l Res. Co.*, 758 F.2d 811 (2d Cir. 1985), but, according to the *Alvarez* court, "*Meckel* was a case about notice," not contract formation, and, thus, "the Court [in *Meckel*] was focused on whether the mailing was sent and unconcerned with whether it was actually received." *Alvarez*, 914 F. Supp. 2d at 258. However, in the Court's view, the *Alvarez* court misconstrues the point made in *Meckel*. The Second Circuit in *Meckel*, in addressing the plaintiffs' denial of receipt of the notice and their claim that other purported recipients' "non-receipt could be inferred from . . . their failure to . . . respon[d]" to the notice, stated:

> New York law holds that when, as here, there is proof of the office procedure followed in a regular course of business, and these procedures establish that the required notice has been properly addressed and mailed, a presumption arises that notice was received. The mere denial of receipt does not rebut that presumption. There must be-in addition to denial of receipt-some proof that the regular office practice was not followed or was carelessly executed so the presumption that notice was mailed becomes unreasonable. *See Nassau Insurance Co. v. Murray*, 46 N.Y.2d 828, 829-30, 414 N.Y.S.2d 117, 386 N.E.2d 1085 (1978). Whether the sender's duty is to sound the drum-beat, send up the smoke signal, or mail the notice, proof that he performed suffices, regardless of what the receiver heard, saw, or read. Under *Nassau*, the controlling inquiry is only whether Citibank fulfilled its duty to send the notice, not whether the holders received it.

*Meckel*, 758 F.2d at 817. Thus, the Second Circuit's discussion, which focused on the sending of the notice rather than the receipt of the notice, was not the result of a lack of concern as to whether the notice was actually received, but, instead, was a focus for purposes of determining whether the rebuttable presumption of receipt arose. Moreover, while it is true that an offer must be received in order to be accepted for purposes of contract formation, New York law does not

require proof of guaranteed receipt of an offer in order to establish the existence of a valid agreement. Instead, proof of the existence of an agreement, which agreement necessarily includes the offer, must be established by only a preponderance of the evidence. Hence, the application of New York's rebuttable presumption of receipt of a proper mailing in *Manigault* was not unsound.

In sum, Couch has failed to come forth with evidence to rebut the presumption that he received AT&T's emails regarding the Agreement, and, consequently, has failed to raise a genuine issue of fact as to whether an agreement to arbitrate was reached. Accordingly, the Court must compel the arbitration of Couch's claims.

## *CONCLUSION*

For the reasons stated above, AT&T's motion to compel arbitration of Couch's claims is granted, and, accordingly, the Complaint is dismissed.

**SO ORDERED.**

Dated: Central Islip, New York
December 31, 2014

/s/
Denis R. Hurley
United States Senior District Judge